UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
THOMAS PODGURSKI,

                        Plaintiff,

    - against -

TOWN OF NORTH HEMPSTEAD and
MEYRAN MARINE SERVICES, INC.,

                       Defendants.

-------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**

CV 10-2316 (ADS)

A P P E A R A N C E S :

    BENNETT GIULIANO MCDONNELL & PERRONE
    Attorneys for the Plaintiff
    494 Eighth Avenue, 7th Floor
    New York, New York  10001
    By:    Nicholas P. Giuliano, Esq.
            Joseph J. Perrone, Esq., of Counsel

    TISDALE LAW OFFICES
    Attorneys for the Defendants
    60 East 42nd Street, Suite 1638
    New York, New York  10165
    By:    Thomas L. Tisdale, Esq.
            Timothy J. Nast, Esq., of Counsel

**SPATT, District Judge.**

    As the Court commented in other maritime cases, never before have water-based

recreational activities been so popular.  Each spring, summer and fall, oceans, rivers, lakes and

bays of the United States team with recreational watercraft.  These craft have to come to rest in

various manners in docks and at anchor, and affixing to moorings in the water.  This case

involves a mooring and the boat operator's attempt to disengage his sailboat from that mooring.

While doing so, his right middle finger was severely injured when it was caught in a carabiner on

a shackle on the mooring ball.  The critical issue in this case is clear.  Was the injury caused in

any manner by the negligence of the mooring service company or the Town of North Hempstead

in not properly preparing the mooring for the acceptance of the vessel, or was it caused by the

negligence of the plaintiff as a result of lack of care on his part, or was the injury caused by the

negligence of both the defendants and the plaintiff.

## I.  <u>THE TRIAL</u>

### A.  <u>The Plaintiff's Case</u>

This case involves an injury to the right middle finger of the plaintiff Thomas Podgurski

(the "plaintiff" or "Podgurski") in an incident that occurred on May 23, 2009 between 1:00 pm

and 2:00 pm.  The plaintiff was going to take himself and his sailing partner out for a sail and

was attempting to disengage his boat from the mooring.  The plaintiff's boat is a 33 foot Dakota

based catamaran sailing vessel.  This was not his customary mooring.  It was a transient mooring

assigned to him by Matthew Meyran ("Matt Meyran"), an employee and the owner of the

defendant Meyran Marine Services, Inc. ("Meyran Marine").

The plaintiff Thomas Podgurski resides in Port Washington and is a co-owner of an

insurance agency.  One of his hobbies is sailing and fishing.  He owned this 33 foot twin engine

catamaran sailboat called the Girlcat.  In the sailing season starting in mid-May, the plaintiff

keeps the Girlcat at the Town of North Hempstead ("Town") mooring areas in Manhasset Bay on

the north shore of Long Island.  The plaintiff applied for a town mooring permit for the 2009

boating season and paid the fee for the permit.  He was advised by the Town that if he needed to

have his mooring installed, he was to call Matt Meyran, the owner of the defendant Meyran

Marine.  Meyran Marine is a designated provider of services for mooring for the Town of North

Hempstead.  Matt Meyran is also the owner of the Port Washington Water Taxi, which has a launch service that transports clients to and from the town dock and their boats.

The plaintiff owned moorings from 2003 through 2009.  All of the moorings were installed by Meyran Marine.  For the 2009 season, the plaintiff launched the Girlcat boat on May 14, 2009.  The day before he spoke to Matt Meyran when he observed that his mooring was not in the water.  Matt Meyran directed him to mooring number 7.  The full name of the mooring is "Thompson Commercial Mooring number 7."  The plaintiff was told that he could use mooring number 7 until his own mooring was available.  After the plaintiff launched the Girlcat on May 14th, from Tom's Point Marina, he sailed for a few hours and then tied up his vessel at mooring number 7.  He spoke to Matt Meyran who picked him up at the mooring.  The plaintiff told Matt Meyran that it was very difficult to pick up the chain.  It was very heavy and he bent his boat back lifting the chain.  He asked Matt Meyran to put a "pickup" on the mooring so it would be easier to use.  Matt Meyran said "don't worry, I'm going to get your mooring done right away." The plaintiff was asked what a mooring typically consists of.  He responded:

> A.     It typically is comprised of the anchor, the chain or two different types of chain that come up to the mooring ball, a shackle on the end of that chain, and then a pennant line, and then a pickup with a float or a stick or something to make it accessible.

> Q.     Was the mooring - - commercial mooring number 7 that Meyran sent you to for your use on May 14, 2009 complete?

> A.     No.

> It only had the items described up to the shackle. There was no pennant and no pickup.

Tr. at 51, 52.[*]

---

[*]Tr. refers to the trial transcript.

When he returned to mooring number 7 on May 14, 2009, the plaintiff used his boat hook to engage the shackle and lift the heavy chain.  The boat hook broke but he clipped on his carabiner.  A carabiner is a metal instrument which is a polished spring-loaded clip used to attach lines.  There was no pennant line and no pickup at mooring number 7.  The top of the mooring ball at number 7 had a shackle but no swivel or pennant line.  The shackle was directly in contact with the mooring ball.  In his water taxi ride with Matt Meyran on May 14th the plaintiff described his difficulty with the chain and he told him about putting a vertical piece of conduit on top of the mooring ball.  The plaintiff then sent a photograph of this type of conduit to Matt Meyran.  (See plaintiff's Exhibit 21).

The plaintiff next used his boat on Sunday, May 17th.  His regular mooring was still not in place and he again went by water taxi to mooring number 7.  As before, the mooring had no pennant or pickup.  It was a "light air day".  The carabiner was still annexed.  From his boat, he picked up the line hand over hand, and reached and grabbed the shackle and disengaged the carabiner.  He held the shackle by putting his middle finger of his right hand through the shackle to support the weight of the shackle and disengaged the clip.  As stated above, the mooring had a shackle but no swivel.  He then went for a sail.  Podgurski returned from the sailing trip on May 17th in the late afternoon and tied up at the same mooring.  He took the water taxi to return to the shore and again asked the driver "to at least put a pennant on the mooring I was using until such time as he would put down my regular mooring."  (Tr. at 68, 69).

The plaintiff next went to his boat on May 23, 2009, on Memorial Day weekend.  He expected his own mooring to be available.  At the very least, if he had to continue to use mooring number 7, he expected that there would be a pennant or a pickup on the mooring.  When the

plaintiff arrived at commercial mooring number 7 on May 23rd where his boat was moored, it

had not changed in any way.  It had the same equipment; meaning, no pennant or pickup on it.

The sailing conditions that day were a little breezier than on the prior occasions.  The wind was

blowing at about 15 knots.  The plaintiff described what happened when he attempted to unhitch

his boat from mooring number 7 on May 23, 2009:

> Q.     Did you attempt to unhitch your boat from the mooring on May 23, 2009?
>
> A.     Yes, I did.
>
> Q.     What happened when you tried?
>
> A.     Well, I picked up the line with the chain following.  I grasped the shackle.  And this is the first time I confronted that the carabiner had worked its way around to the pin and because the opening in the carabiner wasn't wide enough to disengage the pin portion, I had to wiggle it back around to the boat portion.  And I was struggling with that for a little while.  And then it started to tighten up.  And I actually was holding it by my second joint of my finger, and I felt it tightening up, and I was unable to hold that way.  And as I tried to let go of it, my finger got caught between the carabiner and the shackle.  My finger was crushed and bleeding as I pulled away.

Tr. at 70, 71.

The injured finger was the middle finger of his right hand.  The plaintiff stated that for the

period he owned the Girlcat from 2006 to May 23, 2009, he had no experience using a mooring

without a pennant other than commercial number 7.  His regular mooring, at DW61 had a

pennant line attached to the mooring.  (See plaintiff's Exhibits 7 and 10).  Notably, his regular

mooring ball, DW61 has a shackle, a swivel and a pennant line attached to it.

After the injury, the plaintiff's finger was dangling by a thread of skin and flesh.  He put

the finger back in place and covered and wrapped it with eight inch line and applied a tourniquet

to stop the bleeding.  His companion called for help.  A harbor control boat took him to the dock

5

where two ambulances were waiting.  He was taken to North Shore Hospital where he was under the care of Dr. Jacob Cohen-Kashi, a plastic surgeon who performed an operation on his finger. In the operation, a cure nail was inserted to put the two separate pieces of his finger together. The plaintiff passed out from the pain.  He was discharged from the hospital later that same day.

After his surgery, the plaintiff was treated by Dr. Cohen-Kashi.  He was also seen for an opinion by Dr. Tuckman, a hand specialist.  The pin in his finger was removed by Dr. Cohen-Kashi in July 2009.  He was also treated by Dr. Shatzer, a pain specialist, Dr. Gertstein in Manhattan and Dr. David Benatar.  Asked to describe the present condition of the middle finger of his right hand, Podgurski responded:

> A.   I cannot bend the tip digit more than I could six months ago.  It is inflexible. There has been improvement in the second joint.  That has more flexibility.  I drop things due to the sensitivity and weakness of the hand, even though I have been concentrating in the - - at the direction of The Hand Therapy Center and the doctors to use it much more, which I have been.
>
> I have a constant pain when I move it around during the day, and I occasionally take aspirin.  I don't like to take painkillers.
>
> But the biggest problem with the pain is it wakes me at night.  And frequently it cramps up in my arm.  And sometimes it is like when you get a charley-horse in your toe or something, it is very painful.
>
> I can't play guitar, and haven't played professionally.  I have a distinct mental discipline over my finger, and that finger doesn't do what I want it to do.

> Q.   How long have you played guitar?

> A.   Since I was 11 years old, so 40 years.

> Q.   Have you ever played professionally?

> A.   Yes, I played professionally for several years.  I composed music, copy wrote six songs out of about 20 that we used to perform.  And as that career didn't work out for the rest of my life I played guitar.  Not as a performer or anything, but for myself.  I find it very meditative.

I play at the end of the day and find I get myself very centered, where instead of having a drink at the end of a tough day, I find that to be the best thing that used to seminute (sic).

Tr. at 91, 92.

On cross-examination, Podgurski testified that he purchased the Dakota 33 catamaran in 2006 for $119,000.  His boat is still maintained in Manhasset Bay.  He has been sailing recently. He has seen only one mooring ball without a pennant, and he was advised not to connect to it. Podgurski was questioned in detail about how his boat was connected to the Thompson commercial mooring number 7.  On the May 14th mooring connection, the plaintiff discovered when he connected his carabiner onto the shackle that it would not fit over the pin and that it could only go through the bow of the shackle.  The pin was too thick to fit into the carabiner.  So that, as of May 14th, the fact that the plaintiff knew there was only one place to get his carabiner on the shackle, and only one place to remove it is of importance.  On May 14th the plaintiff also knew that tying his carabiner to the shackle was difficult.

Q.     As of May the 14th, you knew that there was only one place that you could get your carabiner on the shackle and one place to get if off; is that correct?

A.     Yes, for the one time that I expected to be connected to that shackle.

Q.     And on May the 14th - - sorry, between May the 14th and May the 23rd, did you ever tell Mr. Meyran or anybody at Port Washington Water Taxi or Meyran Marine that you had only one place to tie into that shackle, and that tying your carabiner to that shackle was difficult?

A.     I repeatedly told them it was a struggle to pick it up because it was so heavy.

Q.     Correct.  You told them it was heavy?

A.     Yes.

Tr. at 114, 115.

The plaintiff was questioned as to whether, instead of disconnecting his carabiner, which he struggled with on May 23rd, he could have just untied his line and dropped it into the water. The plaintiff conceded that it was easy to untie a knot on the line, but instead he elected to take off the carabiner.  In fact, the plaintiff said "Untying the line never crossed my mind."  (Tr. at 118).

When asked about the May 23rd incident, the plaintiff responded that the Port Washington taxi took him to his boat at the mooring.  The winds were blowing at 15 to 20 knots with two feet of chop in the water.  On the boat, he stood on the bow near the cross beam facing forward.  Ms. Arlene Dubin was at the helm in the aft portion in the cockpit where the engines are contained.  The wind was blowing hard and the engines were running.  From where she was standing, Ms. Dubin could not see the mooring ball which was directly in front of him, even though her job was to try to position him over the mooring ball.  There was about 10 to 12 feet of mooring line out to the mooring ball.  As Ms. Dubin drove the boat forward, he pulled the slack line until the mooring ball was close to him.  He pulled the mooring line up until he got to the chain.  At that time the mooring line was slack.  He then grabbed the shackle which was affixed to the mooring ball.  There was no pressure on the carabiner because the mooring line was slack.  The Thompson number 7 mooring ball did not have a swivel on it.  The carabiner was on top of the pin of the shackle.  At that point, the plaintiff's middle finger on his right hand was crushed.

In the cross-examination with regard to the injuries and damages, the plaintiff testified that he was back on his boat about a month after the accident.  However, Arlene did all the work on the boat.  The plaintiff took a pre-planned boat trip to New England for a couple of weeks.  Both he and Arlene did the mooring.  He used his left hand.  The plaintiff last saw Dr. Cohen-

8

Kashi on January 19, 2010.  He tried to play his guitar without success.  In 2010 he took another summer trip.  Also, Matt Meyran advised him that his pennant on his mooring was run over by a boat.  He did not observe that occurrence.

In 2010, after January 19th, the plaintiff did not see any doctors in relation to his finger. He did resume seeing Dr. Cohen-Kashi in March of 2011.

On redirect examination, the plaintiff testified that prior to 2009 Meyran Marine never installed a mooring for him without a permanent pickup.  He then again described how the injury occurred.

Q.    Would you show the Court with the chain and shackle and carabiner how you were attempting to disengage on the day of the accident, May 23, 2009?

A.    I will hold this with my other hand.

I grabbed - - after I picked up the line and this was here, I grabbed the shackle like this.

My primary finger was my lead finger.  The other fingers were in there. And I attempted to control the weight.

I don't have a good grip with this so I'm doing this with the other hand.

So I had it like a fist, and that is my strongest grip.  And I was attempting to work this around.  And as I indicated, it didn't slip as easily as this.

Of course, I was prying and wiggling it and I couldn't do it.  It tightened up.  And as I was trying to pull my finger away from the shackle is when my finger got caught under the carabiner.

Q.    What do you estimate the - - when you pulled the shackle through the hole in the mooring, and you pulled the shackle in the chain up to hold it, what do you estimate the weight of that load to be?

A.    I would say it was 60 or 70 pounds.

THE COURT:      The weight of what?

9

> THE WITNESS:    The weight of the chain as I was holding it to disengage the carabiner.
>
> THE COURT:    How much?
>
> THE WITNESS:    60 or 70 pounds, your Honor.

Q.    As you felt the chain and the shackle start to become tight, did that weight see to increase?

A.    Oh, absolutely it increased.

> MR. TISDALE:    Objection, your Honor, leading.
>
> THE COURT:    It is close, but I will allow it.  A good leading question is: It increased, did it not?  But, did it increase?  I will allow it.
>
> THE WITNESS:    As I felt it increase, I tried to hurry to unclip.

Tr. at 151, 152.

Prior to his accident, on seven occasions, the plaintiff asked Meyran Marine, or an employee of the Port Washington Water Taxi to install his regular mooring.  However, Podgurski also testified that Matt Meyran's work was generally good.

In his deposition Matt Meyran was questioned as to why some moorings have lines and buoys on them and number seven did not.  His response was that they tried to put a minimal of lines on the moorings until they are being used, because they get run over.  However, Matt Meyran also testified in his deposition that once he assigned a transient mooring for someone to use, "it should have a line and a buoy on it."  (Tr. at 157, 158).

Matt Meyran was called as a witness in the plaintiff's case.  He testified that he is the sole owner of Meyran Marine Services, Inc. and Port Washington Water Taxi Co.  Meyran Marine lifts and services moorings.  It also does some dock work, marine service diving and other

services for boats.  Meyran Marine operates in the geographic area between Kings Point and

Matinecock Point and between Little Neck Bay and Hempstead Harbor.  It includes the area of

Manhasset Bay, where the Town of North Hempstead mooring fields are located.

In evidence were two mooring lease agreements between Meyran Marine and the Town

of North Hempstead covering both transient moorings and deep water draft moorings.  (Pltf's

Exhs. 23 and 24).  Also introduced was a mooring inspector's license for Matthew Meyran which

permits him to inspect moorings in the Town of North Hempstead waters.  (Pltf's Exh. 25).

The Meyran Marine Services notebook (Pltf's Ex. 35) indicates that on April 3, 2009,

Tom Podgurski paid $200 for mooring DW61 for the 2009 season.  In May 2009, Meyran Marine

was the owner of Thompson commercial mooring number 7.  Meyran Marine was responsible for

the installation, maintenance and up-keep of mooring number 7.  The Town of North Hempstead

has regulations with regard to moorings.  Matt Meyran testified that when Meyran Marine supply

moorings they also include pennants.  The pennant is installed with a shackle through the

thimble, sometimes directly to the top of the mooring chain and sometimes with a swivel on top.

A thimble is to prevent chafing of the line.  When he installs a pennant, it is expected that the

pennant will last the whole year.  Often a pickup buoy is attached to the end of the pennant line.

Matt Meyran was not sure if the Town of North Hempstead requires the mooring to have

pennant lines on them.  However, he stated that "Often we put pennants on transient moorings

that are used frequently."  (Tr. at 178).  They do not use a pennant line in all situations.

Q.      In all cases it has a pennant line assigned to a customer for use?

A.      No.

11

> Q.    There are times when you design a customer a transient mooring without a pennant line on it?
>
> A.    Yes.

Tr. at 179.

Matt Meyran had discussions with Podgurski concerning where he should put his boat in the water.  He did not remember saying anything about a pennant for the mooring assigned to the plaintiff.  However, Matt Meyran conceded that it would be easier to use a mooring that had a pennant assigned to it.

> Q.    Did you tell Mr. Podgurski that the mooring he was assigned - - Thompson commercial mooring number 7 didn't have a pennant on it?
>
> A.    I don't remember saying that it didn't have a pennant or not.  I said that he can use that mooring.
>
> Q.    For a customer, is it harder or easier to use a mooring that has a pennant on it compared to the one that does not?
>
> A.    Depending on how it is set up, it would probably be easier if a pennant was on it.

Tr. at 181.

If someone was on the deck of a boat four feet over the water, he wouldn't be able to reach the mooring ball, which was 12 to 15 inches out of the water, except by leaning over the deck.  In the period of 2006 to 2008, when the plaintiff had the Girlcat boat, there were years when mooring DW61 was not in the water and he was referred to a temporary mooring.  At that time the temporary mooring had a pennant line attached.  Significantly, other than mooring number 7, Matt Meyran never assigned Podgurski to use a mooring that did not have a pennant line.

Q.   When you put that 250 pound temporary mooring in for his use, would that mooring consist of an anchor, the two-part chain and the mooring ball that we discussed so far?

A.   Yes.

Q.   Did it also have a pennant line attached?

A.   At that time it did.

Q.   Other than commercial mooring number 7, at any time prior to May of 2009 had you ever assigned Mr. Podgurski to use a mooring that did not have a pennant line?

A.   No.

Q.   And I believe we discussed this yesterday, but in your discussions with Mr. Podgurski for his use of commercial mooring number 7 in May of 2009, you did not inform him that the mooring - - commercial mooring number 7 lacked a pennant line; is that correct?

A.   No, I didn't inform him that it lacked a pennant line.

Tr. at 258, 59.

On May 23, 2009, the Town of North Hempstead had not issued a permit for the use of commercial mooring number 7.  According to Matt Meyran, occasionally the bay constable will inspect the mooring and allow Meyran Marine Services to put a mooring into operation without a permit.  However, Matt Meyran doesn't recall whether there were any such discussions with regard to the seven commercial moorings including Thompson commercial mooring number 7 for the year 2009.  Also, he never received anything in writing from the Town of North Hempstead permitting Meyran Marine Services to use mooring number 7 for the year 2009.

Matt Meyran was shown a photograph of five of the Thompson commercial moorings. (Pltf's Ex. 32).  Thompson commercial moorings 3, 4 and 5 all have pennant lines on them.  He

13

can't tell if there are pennant lines on commercial moorings 6 or 7.  However, Matt Meyran indicated that they did not have pennant lines on them.  Interestingly, Matt Meyran conceded that the Town of North Hempstead had a practice of first assigning people to the commercial moorings that had the pennants attached to them.  However, the Town did assign boats to one of the transient moorings that did not have a pennant.

Prior to 2009, Thompson commercial moorings were in place and were operated by Meyran Marine Services.  At that time there were no permits issued.  However, the Knickerbocker Yacht Club, an adjacent land area, did have permits from the Town for these moorings.  In 2008, Meyran Marine Services had a verbal agreement with a Mr. Thompson concerning his commercial moorings.  If these moorings were not being used full time by him, then Meyran Marine Services would be able to use them for whatever they were needed.  While Matt Meyran testified at a deposition that the commercial moorings should be set up with a pickup line, he stated that this was the set up when permanent boats would use the moorings and not when it was to be a temporary mooring, as occurred in this situation.

On cross-examination by his own counsel, Matt Meyran testified that he had an agreement with Mr. Thompson, that Meyran Marine Services and the Town of North Hempstead could use the moorings as "transient overflow moorings."  In 2009, Matt Meyran had conversations with the bay constables about using the Thompson moorings for overflows in the transient field.  They thought it was a good idea, so that the boats would not go into the shore or shallow areas and can be guided down the main channel.  Thompson moorings numbers 1 through 7 are in the channel.  This precipitated a relevant discussion involving the use of pennants in areas near the main channel.

14

Q.      And did you have discussions with the bay constable and others about why having those moorings in place was a good idea?

A.      Yes.

Q.      And what was that?

A.      They thought it was good to have the moorings along the mooring field so that people can be guided down the main channel and not into the shore or shallow areas and go around.

Q.      And are Thompson numbers 1 through 7 on the channel?

A.      Yes.

Q.      The fact that Thompson 1 through 7 are on the channel, does that present any particular problems insofar as pennants are concerned when those moorings are vacant?

A.      Yes.  We tried to limit putting pennants on those moorings because they can get run over by other boat owners.

Q.      And have you had experience with that?

A.      Yes.

Q.      And what has happened in those instances?

A.      I have seen boat owners run over the pennants.  I have seen shafts pulled out of boats nearly sinking them.  I have seen shafts pulled sideways, and then also seen in rough weather people catching them between the rudder and causing damage.

Q.      In fact, can it catch on rudders on sailboats?

A.      Yes.

Q.      And that could be the - - it could leave the sailboat rudderless?

A.      It could leave the sailboat sterning to the wind, and if the weather was rough, it also could remove the rudder on sailboats that were smaller depending on the conditions of the seas.

Tr. at 273, 274.

15

Matt Meyran testified that he did not think that any of the Thompson moorings 1 through 7 had permanent pennants on them.  He stated that he did not need them because they would get dirty with barnacles on them so that anyone picking up the line could cut their hands.  Or, the pennant line remaining in the water "could get run over by a boat causing damage to the boat." (Tr. at 275).  Matt Meyran testified that the Thompson moorings 6 and 7 never had a pennant on them.  He explained that "it was definitely safer not having a pennant on that line when the mooring was not getting used."  (Tr. at 278).  Also, he explained later that moorings 6 and 7 are in a main channel where the main traffic rounds the buoy, inferring that a pennant in those areas would more likely be run over by boats using the main channel.

Matt Meyran testified that if the plaintiff had kept his boat on Thompson commercial mooring number 7 for the entire period of the summer season to September "it would have been a permanent mooring," in which event he would have had a pennant line.

> Q.     Mr. Meyran, my question was:  Is the only thing that changed Mr. Podgurski being on commercial mooring number 7, his stay there being temporary from it being permanent as you just described, is whether you stuck a pennant on it or not?
>
> A.     Yes.
>
> Q.     And so whether you rigged commercial mooring number 7 in a manner consistent with your agreement with Mr. Thompson is solely a matter of whether you chose to put a pennant on it?
>
> A.     Yes.
>
> Q.     Would you agree with me that a mooring, for virtually all the customers that Meyran Marine Services has, with a pennant line on it is easier to use and safer to use than one without a pennant on it?
>
> A.     A line with a pennant and loop is easier to use.

Tr. at 287, 288.

16

Meyran Marine Services uses one man to install pennants in addition to Matt Meyran, who is experienced in installing pennants.  Surprisingly, Matt Meyran testified that it takes only five minutes to install a pennant.

Q.   And approximately how long does that process of screwing the shackle, putting the thimble into the shackle, putting the pin back into the shackle, and seasoning the shackle?

A.   Five minutes.

Q.   So you could have at any time before Mr. Podgurski got his vessel to the location of Thompson mooring number 7 taken five minutes of your time, or your other employee's time, and made that mooring safer by placing a pennant on it?

A.   If Mr. Podgurski gave us enough allowance to do that, when the day he called was a busy Saturday, umm, and not allowing us to put that line on the mooring before he got there.

Q.   And I just wanted to refresh your recollection a little bit.

The question was that the vessel ran on May 14th, which was a Thursday, 2009.  And you testified that you did not dispute that he contacted you on May 13th, which was a Wednesday.

What was the pressing business on May 13th, or May 14th, before he got there in the afternoon, that would not have permitted Meyran Marine Services for the five minutes it would have taken to install that pennant line?

A.   I don't remember hearing from him the day before.  I remember hearing from him that day that he was coming in, the boat was in the water and he was on his way over.  That's what I recall.

And I was on the work boat at the time, but we didn't have the pennant line available at the time.

He got to the mooring ahead of us, snapped into it, the way he usually snaps into the top of a line or whatever he snaps into, and used his pennant line on that mooring.

Tr. at 289, 290.

17

In colloquy with counsel on July 25, 2011, the Court asked the defendants' attorney Thomas L. Tisdale to define a "pennant."  He responded: "A pennant is that line, any line, that connects a boat to a mooring."  (Tr. at 307, 308).

Claudio Norman Crivici was called by the plaintiff as a maritime expert.  He is a 1985 graduate of SUNY New York Maritime School also known as Fort Schuyler.  Upon graduation, he fulfilled the requirements to be awarded a United States Coast Guard Third Mate's license.  He also graduated with an Ensign's commission in the United States Navy.  This would permit him to operate in a master's position, as a captain of a vessel with limited tonnage.  Crivici has been a marine surveyor since 1985.  His regular duty is to inspect vessels, ranging from yachts to large ships.   He inspects damaged vessels and forensically determines what caused the damage.  He also performs general inspections of vessels to make them safer.  He also makes inspections for marinas, shipyards, yacht clubs and other operations.  His company was engaged by different municipalities to review moorings and mooring safety, and the capabilities to withstand storms.  He has investigated the reason for vessels who broke free from moorings and for the failure of moorings.

On a personal level, he has been an avid boater his entire life.  He has had his own boat on moorings on the north shore of Long Island, mostly in the Huntington and Centerport harbors.  For a brief period in the late 1980s he did moor a vessel right off the Manhasset Yacht Club.  He also worked with a company that installed and maintained moorings in harbors on the north shore.  He also removed moorings at the end of the winter.

Crivici was retained by the plaintiff's counsel to do an evaluation.  He did a full evaluation in that he met with the plaintiff on his vessel and inspected the vessel and had the

18

plaintiff demonstrate how his injury occurred.  He described the mooring ball at number 7.  There is a tube through the center of the mooring ball to allow a chain to come up through the bottom of the mooring ball to the swivel which is attached to the shackle.  A complete mooring system would include a mushroom anchor on the bottom, a bottom chain, an upper chain, a float, to a swivel and then a shackle and a pennant and then a pennant pickup buoy.

Crivici was shown a photograph of number 7 mooring.  (Pltf's Ex. 19).  He stated that it would not be a complete mooring because the pennant was missing as was the pickup buoy and a pickup line.  He pointed to a photograph of another similar mooring taken on the same day (Pltf's Ex. 22) which was equipped with a pennant and a pickup float.  Crivici estimates that he has been to between fifty and one hundred mooring fields.  During those occasions he has been directed to use transient moorings and other moorings.  He never used a mooring that did not have a pennant line or a float or pickup on it.

Q.    Can you estimate for us approximately how many mooring fields you have been to?

A.    Fifty to a hundred.

Q.    On those occasions, were you ever directed to use a transient mooring or one of the other moorings?

A.    Yes, I have been.

Q.    On any of those visits, were you ever directed to a mooring that did not have a pennant line or a float on it?

A.    I have not.

Q.    Are you aware of any mooring - - commercial or recreational mooring fields that are used by the recreational boating public that equip their moorings so they - - such that they don't have a pennant or a pickup on it?

A.   All the moorings have to have a pennant to attach to the mooring.  I have only seen those set up as we discussed previously.

Q.   When you say "as we discussed previously," you mean with the pennant?

A.   Equipped with the pennant, yes.  A soft line that can be attached to the vessel.

Tr. at 339, 340.

Crivici testified that he works for a company that installs moorings in the Town of Huntington.  The moorings installation was "loosely administered" by the harbor master.  The moorings were equipped with pennants and pickups.  Crivici was questioned about the purpose of the pennant and the pickup and he responded in the following manner:

Q.   And when those moorings were set up for customer usage, did they have pennants for pickups - - and pickups?

A.   The moorings were equipped with pennants and pickups.

Q.   What is the purpose of the pennant and pickup?

A.   The purpose of a pennant and pickup is to facilitate safe use of the mooring ground tackle, the ground tackle referencing the chain and anchor, the float.  It is the ability to pick up a mooring repeatedly in a safe fashion.  And that is one of the reasons why you want a pennant.

It also expands the circumference of the area where the mooring ball is, to allow a safe pickup without requiring lifting a heavy object.

Tr. at 340, 341.

In his field inspection Crivici measured the freeboard of the plaintiff's boat to the waterline to be approximately 45 inches.  This would make it very difficult for someone on the boat to lean over to the mooring to unshackle the vessel.  Offered in evidence as plaintiff's exhibit 58 was a pickup buoy with a line.  This device further facilitates the easy picking up of the pennant.  In his own travels, Crivici has maintained a sailboat on a mooring for 15 years.

When he has traveled to other areas he often used a transient or rental mooring and "the pennant

is always on the mooring."  (Tr. at 355).

> Q.     Do you have experience in either renting permanent moorings or transient
> moorings?
>
> A.     I maintained my sailboat on a mooring I owned for 15 years.  That mooring was
> either installed by myself or a master commercial operator.
>
>         When I traveled to other areas, I often used a transient or rental mooring to
> moor my vessel.
>
> Q.     When you would hire a commercial operator to set up a boat mooring or did it
> yourself, did it include a pennant line?
>
> A.     Yes.  The pennant is always on the mooring.
>
> Q.     And how about - - you indicated when you went to various transient moorings.
>
> A.     That's correct.
>
>         When I was visiting other harbors or a restaurant that would be on the
> water, there are transient moorings that you can use, either by direction or for a
> fee, and they were always equipped with a pendant. (sic)

Tr. at 355, 356.

A portion of the Meyran deposition – previously introduced in this trial – was read to

Crivici and he agreed.

> Q.     Would it be fair to say that once you assign a transient mooring for someone to
> use it, it should have a line and a buoy on it?
>
> A.     Yes.
>
> Q.     Would you agree with that statement?
>
> A.     That a transient mooring should have a pennant on it?
>
> Q.     Yes.

      A.      Yes, I do agree with that.

Tr. at 356.

A major point of the Crivici testimony were his opinions as a maritime expert in this

field.

      Q.      Do you have an opinion as to whether a transient mooring without a pennant on it is defective or dangerous?

      A.      I believe a mooring that does not have a pennant on it should not be offered up for service.

      Q.      And you read Mr. Podgurski's testimony, even his trial testimony given here, and he indicated that the mooring he was assigned to by Mr. Meyran did not have a pennant on it when he arrived to use it on May 14, 2009.  Is that correct?

      A.      That is what was reported, yes.

      Q.      And do you have an opinion as to whether, on May 14, 2009, when he was assigned that mooring, whether it was suitable for his use?

      A.      I do not believe that the mooring was suitable for its intended purpose at that point.

      Q.      Can you tell us why it was unsuitable for its use?

      A.      The mooring was not equipped with a pennant or a pickup.

      Q.      Are you familiar with the operation of installing a pennant line on a mooring?

      A.      Yes, I am.

      Q.      Have you seen Mr. Meyran's testimony where he indicated it takes approximately five minutes?

      A.      Yes, I did.

      Q.      Do you have any reason to disagree with that?

      A.      No, I don't.

Tr. at 357, 358.

Crivici also testified that installing a pennant is not a complicated job and can be done while the vessel is tied to the mooring.  In his opinion, after May 14, 2009 and before May 23, 2009, Meyran Marine could have added a shackle and pennant to the mooring number 7 "without interrupting or even having to untie Mr. Podgurski's vessel."  (Tr. at 358).

Further with regard to the plaintiff's efforts to untie the vessel on May 23rd, Crivici stated that, with the weather conditions on May 23rd including a wind of 15 to 20 knots, "with the methodology that the vessel was tied up at the time of the casualty, it was substantially more complicated."  (Tr. at 359).  He described the attempt to unfasten the plaintiff's vessel on May 23rd under the conditions then existing.

Q.    Would you tell us what your opinions were concerning your investigation into how the accident happened?

A.    Simply that I believed that for the mooring to have been safely utilized, it should have been equipped with a pennant and a pickup.

It was also my opinion that the ability for an average sailor to be able to pick up and rig it was probably beyond most sailors' normal routines and probably within - - not within a lot of sailors' capabilities.

Tr. at 362.

Crivici testified that he was never assigned by a maritime commercial operator to use a mooring that did not have a pennant.  It should not have been assigned to the plaintiff.  The plaintiff also had the same experiences.  Prior to this occurrence, he was never assigned to a mooring without a pennant.  Also, on the day he did his inspection, Crivici had the opportunity to pull the mooring chain up to the deck of the plaintiff's vessel, and he estimated the weight to be over 60 pounds.  That is a fairly heavy load to handle.  Having a pennant and a pickup line "actually facilitates in the ability to pick up a mooring safely and repeatedly."  (Tr. at 366, 367).

23

Crivici described in graphic detail what the plaintiff had to do to try to detach the vessel from the

mooring without a pennant.

> A.    So, he had to release the carabiner from the shackle, and obviously the mooring
> ball was well below the deck or the crossbeam on the vessel.  So, he either had to
> do it from a small vessel, to get down closer to the water, or by doing it on his
> vessel, he had to get away to lift the carabiner to a point where he can safely lift it
> in his hand - - with his hand.

> Q.    Was that, the method he had to undergo to release his vessel from the mooring, in
> your opinion, safer and easier than if it had a pennant line, or more difficult and
> more dangerous?

> A.    It was definitely more difficult and dangerous, because it required now a lifting
> procedure and a releasing procedure directly from the mooring ball versus just
> simply releasing a pennant and a pickup buoy from the deck of the vessel and just
> letting them drop into the water safely.

Tr. at 367, 368.

The final question on his direct testimony summarizes Crivici's opinion in this matter.

> Q.    Do you have an opinion as to whether Mr. Podgurski would have been injured in
> the manner he was on May 23, 2009, if the mooring had had a proper pennant
> installed by Meyran Marine Services?

> A.    I firmly believe he would not have been injured in the same way or any way.

Tr. at 373.

On cross-examination it was brought out that Crivici was not licensed to be a harbor

master, mooring inspector or a bay constable.  However, it was also brought out that he had

installed several hundred moorings.  At this time, he installs his own mooring each year.  He has

also examined a vessel that was damaged because it ran over a pennant line.  He stated that

running over a mooring pennant can cause serious damage to a boat.  Crivici doesn't see the

pennant in the water as a danger unless it is in the channel.

In his cross-examination of Crivici, counsel for the defendants went through the acts of

the plaintiff at the time of the injury.  The boat was driven up to the mooring ball and the

mooring line was pulled up and caused to be slackened.  At that point the line got heavier and heavier because the boat was pulling away or changing its direction.  There was a vertical and a horizontal component.  As the boat drifted back there is more chain that gets pulled off the bottom and the plaintiff was lifting more weight.  At this time, the plaintiff was trying to take the carabiner off the shackle.  It was Crivici's understanding that it was at this point that his finger got caught between the shackle and the chain.

In fact, in his report in his findings and opinions, Crivici stated: "It was during this awkward maneuver that the plaintiff's right middle finger became caught in the shackle/chain resulting in injury."  (Tr. at 411).  This opinion was rendered by Crivici based on the deposition he read and the demonstration which Podgurski provided.  Crivici also testified that it "was not a good maneuver to put your body into" and "not a good place to put your finger."  (Tr. at 412).  Crivici completed that thought by saying "a properly trained sailor should not have tried to secure a chain with their finger"  (Tr. at 412) and "a properly trained individual would not have put their finger inside the shackle."  (Tr. at 421).

Mallory Nathan is a Senior Bay Constable of the Town of North Hempstead.  He appeared pursuant to a subpoena.  He works for the Department of Public Safety which is responsible for the public waterways and structures in the Town of North Hempstead.  It is his obligation for the Town of North Hempstead to enforce the Town local laws including § 42-11 entitled "Moorings" and the provision that says:

> (4)  The Director Harbor and Marine Enforcement, in conjunction with the Commissioner of Planning, shall establish minimum mooring tackle guidelines. All mooring tackle shall be subject to periodic inspection in accordance with § 42-5H.

25

Nathan was shown a document entitled "Town of North Hempstead Town Dock Mooring Ground Tackle Regulations and Requirements."  (Pltf's Ex. 60).  He stated that he never saw this document before.  He was also shown another document entitled "Mooring Tackle Guidelines." (Pltf's Ex. 61).  Nathan did recognize this document as "the guidelines for mooring tackle." Referring back to the Town local law, there is a provision that states:

> (3)  All moorings shall be placed and maintained in accordance with federal, state and town procedures.

Nathan explained that the Town issues permits for moorings.  The plaintiff's mooring permit was issued by the Park Department, which also issued a permit for John Thompson for commercial mooring number 7.  (Pltf's Ex. 33).  Also, part of the Moorings Regulations is a regulation which states that:  "Upon the expiration of a permit, any mooring and all mooring tackle shall be removed by the owner."

By reason of the fact that the permit in evidence, plaintiff's Exhibit 33, was issued on August 17, 2009, after this occurrence, Nathan testified that no one had a valid permit between January 1, 2009 and August 16, 2009.  However, even if there was no valid permit for the subject mooring on May 23, 2009, the date of this occurrence, a non-permitted mooring could be used. This was because the mooring upheld the integrity of the channel.  Notwithstanding his opinion on non-permitted use, Nathan conceded that "according to the regulations, the mooring should not have been used."  (Tr. at 437).  The regulation he referred to was § 42-11 subdivision A(1) which provides that "No person shall place or use any mooring . . . in the waterways of the Town, without obtaining a permit under this chapter from the Town Clerk and paying the required permit fee."  Nathan did not authorize Meyran Marine to use mooring number seven for its

26

operation.  He does not know if anyone else had given such authorization.

With regard to the Mooring Tackle Guidelines, (Pltf's Ex. 61), Nathan testified that "These are strictly guidelines," not regulations.  (Tr. at 438).  However, he explained that the guidelines are essentially the minimum requirements for mooring in Manhasset Bay. Significantly, the "Minimum Mooring Tackle Specifications" in the guidelines include a pennant. Of importance, Nathan testified that the mooring installed in Manhasset Bay should have a pennant.

> Q.   Also within the chart, it details the pennant diameter.
>
> A.   I see that.
>
> Q.   And so, would you expect that at a minimum, any of the moorings installed in Manhasset Bay would have the appropriate size mushroom, ground chain, riding chain and pennant diameter as part of the mooring?  Is that correct?
>
> A.   Yes.
>
> Q.   Would you expect the mooring to have anything else with it?
>
> A.   Besides the anchor, the two types of chain, a mooring ball, a pennant, the appropriate shackles.  That's all you would need.
>
> Q.   So all those items would be part of a proper mooring in the Town of North Hempstead, Manhasset Bay?
>
> A.   Yes.

Tr. at 441.

In 2009, the Town of North Hempstead did not have a dock master.  The Town dock falls under the jurisdiction of the Parks and Recreation Department of the Town, under the Deputy Commissioner.  He is familiar with the operation of the Town transient moorings.  They are on a first come/first serve basis.  They are free for 48 hour use.  The boats can tie up to a transient

mooring without charge and can have the mooring for 48 hours, and, in fact, can stay longer.

Nathan was asked to describe the making of a transient mooring. He responded that a transient

mooring consists of "A mushroom anchor with adequate chain and a mooring ball." (Tr. at 443).

When he was specifically asked if they also had a pennant and a pickup float, he stated, "Some

do, and some do not." (Tr. at 444). He also stated that if the boater doesn't feel comfortable, he

could have a pennant put on. Nathan was questioned as to who would install the pennants.

Q.      So, if they ask to have a pennant put on, you would do that immediately?

A.      Well, we will have Port Washington water taxi, Meyran Marine Services, do that. We have the pennants available and go out and attach the pennant, if the boater doesn't feel comfortable putting the line through or attaching their own lines.

        There are different reasons to want to do that. Some boats have very high freeboard. It is not convenient. They may not feel they have the skill necessary to, you know, get the - - to the mooring to do that. It is really a personal preference.

Q.      If a boater asked to have a pennant line placed on it, how quickly would you, as the bay constable for the Town of North Hempstead, expect them to install that pennant?

A.      Almost immediately, while they wait.

Q.      So, if someone asked for a pennant and it wasn't installed three days or a week later, that would not be within the arrangements that you have with Meyran Marine Services for the installation of the pennant on transient moorings?

        MR. TISDALE:        Objection, your Honor.

        Talking about arrangement with Meyran Marine Services.

        THE COURT:        Overruled.

A.      I don't believe we have any, like, arrangements stated, like, on paper. This is a common sense kind of thing. If people need a pennant, please put a pennant on for them, and he will do so.

Q. Now, you were talking a little earlier about the different mooring arrangements for boats, and some would be - - would feel more comfortable with a pennant and some would not.

Does some of that have to do with the size of the vessel?

A. It would have to do with the freeboard of the vessel. You have short boats with a large freeboard, and you also have large boats with small freeboard. It all depends on the preference of the operator.

Tr. at 444-46.

Nathan actually helped people use transient moorings without a pennant. He said: "Pass me your line. Stick it through the shackle. I hand it back to them and everything is good." (Tr. at 447). Of importance, Nathan also discussed the question of the height of the freeboard of the vessel as a factor when there is no pennant.

Q. Mr. Nathan, we were discussing a little earlier whether the freeboard of the vessel connecting with the mooring ball without a pennant is a factor.

A. Absolutely.

Q. Would you agree that the higher the freeboard, the harder it is to connect to a mooring without a pennant?

A. Yes.

Q. Is it also fair to say that the freeboard becomes a significant impediment when, from the level of the freeboard, the person on board the vessel can no longer reach the mooring ball by just reaching down, even when laying on the deck?

A. If they tried to attach their own line from the bow of the boat and there is a high freeboard, it can be difficult.

Usually, a boat with a high freeboard in the bow would have an area that is accessible or closer to the water on another part of the boat.

Q. And if you had an area of the vessel - - all the areas of the vessel are higher than a person can reach the mooring ball, without a pickup line on it, would the free - - would it be an impediment to reach it without the pennant line?

29

A.    Yes.

Tr. at 449, 450.

On cross-examination, Nathan testified that some of the transient moorings do not have pennants on them.  Pennants have a tendency to get dirty.  Also different kinds of "things" will grow on the line and you can cut yourself on barnacles, and it becomes a "filthy mess."  (Tr. at 452).  According to Nathan:  "It is not an ideal situation to have a pennant in the water for a length of time without being used."  (Tr. at 452).  When asked about safety conditions, Nathan responded that:  "The only safety conditions are with the other boats actually going on that line and bringing it into their running gear and perhaps foul the prop or causing damage to a shaft or an outdrive or a rudder."  (Tr. at 452).

Nathan himself maintains seven boats in Manhasset Bay, including his own boats and the patrol boats and work boats of the Town.  Occasionally he moors his boats on the Town mooring. In particular, one of the boats is exclusively on a mooring.  That mooring is not equipped with a pennant.  He attaches that boat to the mooring by running a line through the top shackle and attaching it to two cleats on the vessel.

While his office does not have anything to do with the issuing of permits for the moorings, he gets a copy of the permit after the fact.  When asked about the Thompson moorings, one through seven, Nathan stated that he wanted them there.

Q.    You were aware that Thompson moorings one through seven were in place in 2009, and I think you said you wanted them there?

A.    Yes.  We actually - - I advocated to the Town to allow them to stay in the water.

Q.    And you were aware some had pennants on them and some did not?

30

A.      I did not even think about the pennants.  I can mentally see the moorings, but I do not know whether they had pennants on them.

Tr. at 455.

At this point in the trial the plaintiff rested.

While the attorney for the defendants did commence making motions at the end of the plaintiff's case, those motions were withdrawn.

## B.  The Defendants' Case

In his second appearance, Matt Meyran testified on behalf of the defendants.  Matt Meyran had considerable maritime experience and various licenses, including one for a mooring inspector.  Matt Meyran also had extensive work experience on the waterfront including various yacht clubs in North Hempstead and Port Washington.  In 1996, he started his own marine business with Meyran Marine Services and the Port Washington Water Taxi.  The primary business of Meyran Marine Services is hauling and setting moorings.  The business of the Port Washington Water Taxi is to provide a launch service to and from vessels in Manhasset Bay and to harbor towns around the bay.  In 2009, there were six to seven mooring inspectors in the Town of North Hempstead.  Also, in 2009 there were approximately 800 moorings in Manhasset Bay.  Meyran Marine had some involvement in 80% of the moorings.  Meyran Marine would haul and set the moorings on top of the float for the various yacht clubs and for individuals persons and associations in Manhasset Bay.  At the town dock, the company rented approximately 80 moorings in 2009.

Of the 80 moorings Meyran Marine rented in 2009, 20 to 30 used carabiners.  Matt Meyran described how the carabiner was used in the mooring process.  In his description, he

mentioned that the carabiner was spliced on the pennant.  Introduced in evidence as defendants'

Exhibit AQ, is a 12 foot pennant with a thimble spliced into it and a loop spliced on the other

end.  A thimble is a steel loop that is spliced at the end of the pennant line.  Matt Meyran stated

his understanding of what is a "pennant."

> A.      A pennant is that line that would go from the top of a mooring ball, or even
>         underneath the mooring ball, to a boat by either a cleat or snap, or somehow tied
>         up to the boat.

Tr. at 494.

When the plaintiff used his regular mooring at DW61, he would snap his pennant line

into the top of the pennant line that was on DW61 to make one continuous pennant.  Matt

Meyran produced a shackle in court.  It was a Chicago brand five-eighths shackle from his

inventory.  He uses the shackle on top of the mooring balls.  This was the kind of shackle that

was on the top of Thompson mooring number 7.  During the regular season he begins to start

working on the moorings in March.  After the boats are launched for the season either the marina

or the owner would place them on the moorings.  Matt Meyran testified that at the beginning of

the season when he begins setting the moorings in place, "sometimes" he puts pennants on them.

> Q.      At the beginning of the season when you begin launching pennants - - I'm sorry.
>
>         At the beginning of the season when you begin launching moorings, or
>         setting moorings in place, do you put pennants on them?
>
> A.      Sometimes.
>
> Q.      On what occasion do you put some on and some not?
>
> A.      Usually on the existing AW line we would put pennants on a couple of the
>         moorings when we would know that boats are being launched early, so that the
>         marina or yacht club would come over and drop a boat on one of those moorings.

Q.       Otherwise, when do you put pennants on them?

A.       Either when the owner calls us and says they are coming out and want a pennant.

They also make a dish that you can throw the line on the top of.

Tr. at 497.

DW61, the plaintiff's regular mooring requires a special permit from the Town of North

Hempstead.  The plaintiff's boat is 33 feet long and requires a 300 pound mooring, rather than

the usual 250 pound mooring.  Its mooring goes in later because of its larger swinging radius.

". . . [w]e have to wait for the other moorings to be installed to allow for the swinging radius so

his boat doesn't hit others."  (Tr. at 498, 499).  There are no other 33 foot boats in the Town of

North Hempstead dock area within Manhasset Bay.  Outside that area in the deep water draft area

there are boats over 30 feet long.  These deep water draft moorings are charged $1,500 for the

season, which includes the mooring, the launch service, parking for the season and any

maintenance on the mooring.

For the moorings within the town dock area, the boat owner is not required to use the

services of Meyran Marine.  The boat owner has the obligation to obtain a permit to use the

mooring.  Matt Meyran's company does not receive any compensation from the Town; its

compensation is from the boat owners.  As to the installation of pennants it is easier to put the

pennant on the mooring in the beginning than it is later.  The explanation Matt Meyran gave for

not always placing a pennant on a mooring is that it is not always safe, with regard to being run

over by other boats and causing barnacles to form.

In 2009, Meyran Marine had entered into an agreement with Thompson.  In the agreement

Thompson was given permits for the moorings involved and Meyran Marine would install the

33

moorings, after which Thompson would try to sell the moorings.  Meyran Marine would receive $750 for the mooring, the launch service and the service of the moorings.  Thompson would then charge the boat owner, "anything he would like."  (Tr. at 506).  However, as to the Thompson moorings, if he was unable to find a seasonal tenant, Meyran Marine could use the moorings as it saw fit.  With respect to responsibility, if any, in this case, the Court notes that Meyran Marine placed Thompson 1 through 7 moorings.  By May 2009, Thompson had not yet received the permits for his moorings.  He was still in negotiation with the Town with regard to the permits. In this regard, of importance in this case, Meyran Marine applied the mooring balls to the top of the chains.  Also, in agreement with the Town, Meyran Marine could use the Thompson moorings as an overflow in the transient mooring field.  If Meyran Marine put overflow customers on these moorings, there was no additional compensation to Meyran Marine except for the use of its water taxi.

On May 14, 2009, there was no other mooring in the town dock area that could have been safely used by the plaintiff's boat.  This was because of the larger swinging radius of the Podgurski boat.  At DW61, his regular mooring, he had a heavier 300 pound mooring.  However, the DW61 mooring was not available and the plaintiff was assigned to Thompson mooring number 7, which was the closest to the town dock area.  He needed to place the other boats in moorings first, so he could determine the swinging radius.  Matt Meyran testified that, at the time, mooring number 7 did not have a pennant on it, "because it wasn't used full time."  (Tr. at 514).  The plaintiff did not object to using mooring number 7.  The plaintiff did use mooring number 7 on May 17th and attached his boat by his own pennant line.  He had no problem using his own line as a pennant annexed to the mooring.

As a mooring inspector, Matt Meyran was not aware of any regulations that require

pennants to be affixed to moorings at all times.  Other catamarans affix themselves to moorings in a number of ways.  Sometimes they will have a pennant line that is split into a bridle; sometimes with loops on either ends of the bridle; sometimes they want swivels or thimbles on either end; sometimes they are tied to the top of the mooring ball; and sometimes they are put on with a large stainless steel carabiner slip with a four inch throat (opening).  The carabiner at issue in this case, which was used on May 23rd, "looks like a five-eighths or a three quarter inch throat."  (Tr. at 518).  In addition, on a material subject, Matt Meyran testified that not all his transient mooring customers have pennants on their moorings, although some of them do have pennants annexed to their moorings.

Today, six of the Thompson mooring lines 1 through 7 are occupied by a boat rental company.  As to those six moorings "there is a pennant line from the top of the ball to the boat." (Tr. at 519).  The one empty mooring does not have a pennant on it.  There are a number of ways in which boats are affixed to moorings when there isn't a pennant on the mooring.  Matt Meyran described different ways that you can put a pennant on a mooring, using the shackle on the top of the mooring.  Also, in his experience as a mooring inspector, attaching a carabiner to the shackle was an acceptable mooring arrangement.

Prior to May 23rd, Matt Meyran did not know how the plaintiff was letting go of the mooring or releasing his boat from the mooring.  The plaintiff never mentioned that he had any difficulty getting his carabiner over that shackle.  Matt Meyran described another type of carabiner which was used for moorings.  As he stated previously, this carabiner had a larger throat, could handle a heavier boat and was easier to snap onto shackles.  As an experienced mooring inspector and mooring installer, in Matt Meyran's opinion it was "not a good idea" for

an experienced sailor to put his finger in the shackle and keep it there while the chain was on a

heavy load, "because you could get hurt." (Tr. at 533). He also gave an opinion, based on his

experience, that a pickup buoy does not assist in letting go of a mooring, "it actually gets in the

way." (Tr. at 534).

About a month after the accident, Podgurski asked for his regular DW61 mooring. Matt

Meyran then went out and got his DW61 mooring and placed it in the water. Matt Meyran

concluded his direct testimony in the defendants' case by estimating that he has hauled, replaced

or set thousands of moorings without a prior claim or complaint.

On cross-examination Matt Meyran testified about his agreements with the Town of

North Hempstead, under which Meyran Marine was to be paid for its services in installing

transient moorings for the Town's use. It no longer receives any compensation from the Town.

In evidence is a white rope, approximately 25 feet long with a 3/4 inch diameter, (Dfts'

Ex. AQ), which is exactly the same line that is on the Podgurski mooring. This mooring line or

pennant meets the requirements of the Town mooring guidelines for a 300 pound mushroom.

Thompson mooring number 7 has a 300 pound mushroom and the mooring line in evidence

would have been a sufficient pennant line for that mooring. On May 14, 2009, Meyran Marine

possessed extra pennant lines similar to defendants' Exhibit AQ. So that if Meyran Marine

wanted to, it could have installed such a pennant line on Thompson commercial number 7.

However, a pennant line in the water is subject to fouling with growths. Sometimes the boat

owner would clean the moorings and sometimes they will call in advance and ask Meyran Marine

to clean them. Cleaning the pennant line is more work than installing the pennant line.

However, Matt Meyran stated that the company does not have an obligation to keep the pennant

line cleaned.  A pennant line cost approximately $45 to $50 in a finished state; the line itself is about $20 to $25.  It is included in the price when a customer rents a mooring from Meyran Marine if they want a pennant line.

Podgurski owns the DW61 mooring.  He pays Meyran Marine $200 per year for hauling, setting and maintenance on his mooring ball and chain.  It took him about an hour to install the DW61 mooring.  When boat owners obtained permits from the Town, they received written notice that if they need to have their mooring installed, call Matt Meyran.  (Pltf's Ex. 5).  Of importance in this case, Matt Meyran testified that when he installed the mooring for Podgurski he always included a pennant line.

Q.  My question actually had nothing to do with whether it is the exact same mooring or not.

My question is:  When you installed the mooring for Mr. Podgurski, did you always include a pennant line?

A.  Yes.

Q.  And you knew every year you always installed, and going to 2008, 2009, 2010, when you went to install DW61, it would include the anchor, the chain, the mooring ball, the necessary shackles and a pennant line for him to use?

A.  Yes.

Q.  And so you knew that his boat was set up to use a mooring in that configuration?

A.  Yes.

Q.  And on May 13th or 14th of 2009, whether it was the day before, as Mr. Podgurski testified, or the day of the bringing his boat into the facility as you testified, you knew that on all prior occasions his use of moorings in the Town of North Hempstead, his mooring always had a pennant line?

A.  Yes.

*     *     *     *     *

Q.     And the issue is whether you told him specifically that there was no pennant on the mooring in the conversation you had with him.

A.     I'm sorry, I don't recall.

Tr. at 554-556.

Matt Meyran uses work boats for his mooring work.  The freeboard in the stern of the work boat is two and a half feet, which is "considerably" less than the approximate four feet of the Podgurski catamaran.  Also, for a boat that has three and a half feet or higher of freeboard, having a pennant line makes the mooring easier to use than if it does not have a pennant line.  In addition, of importance in the Court's view, Matt Meyran testified that he never saw anyone use the Manhasset Bay moorings without a pennant.

Q.     Did you ever see somebody use the Manhasset Bay moorings without a pennant on them?

A.     I can't say that I had.

Q.     Would you agree with me that for a boat that has three and a half feet or higher of freeboard, having a pennant line makes the mooring easier to use than if it does not have a pennant line on them?

A.     Yes.

Tr. at 562.

Manhasset Bay is approximately two and a half miles long and a mile and a half wide. When asked to compare his maritime license with that of the plaintiff's expert Claudio Crivici, Matt Meyran conceded that:  "He put his time in and his would be superior."  (Tr. at 563).  Matt Meyran also testified that one person operating alone can install a 300 pound mooring.  Adding a few other facts of interest, Matt Meyran stated that the Town of North Hempstead assigns a

38

particular boat to a particular mooring spot.  However, Podgurski owns the mooring equipment at DW61, including the 300 pound mooring given to him by Matt Meyran in exchange for a 150 pound mooring.

Both sides rested.

No motions were made by either party at the end of the entire case.

## II. <u>DISCUSSION</u>

### A. <u>The Liability Standards</u>

This case is controlled by admiralty law because the incident occurred on navigable water and had a substantial connection to traditional maritime activities.  See <u>Yamaka Motor Corp. v. Calhoun</u>, 516 U.S. 199, 206, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996); <u>Moore v. Matthews</u>, 445 F. Supp. 2d 516, 521-22 (D. Md. 2006).  As far back as 1866, the rule has been that "Every species of tort, innocent occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance."  <u>The Plymouth</u>, 3 Wall. 20, 36, 18 L.Ed. 125 (1866).  <u>See</u> <u>also</u> <u>Foremost Insurance Company v. Richardson</u>, 457 U.S. 668, 672, 102 S.Ct. 2654, 2657, 73 L.Ed.2d 300 (1982) ("if the wrong occurred on navigable waters, the action is within admiralty jurisdiction").  In deciding when an activity bears a substantial relation to "traditional maritime activity," the Supreme Court has held that even a boat docked for storage and maintenance was engaged in traditional maritime activity.  In <u>Matter of the Complaint of Delmarine, Inc.</u>, 520 F.Supp.2d 422, 429, (E.D.N.Y. 2007) it was stated that "it is difficult to conceive of anything that a boat could do in the water which would not qualify as a traditional maritime activity."

A tort claim involving a boat used for pleasure purposes on navigable waters comes within the admiralty jurisdiction of the federal courts.  See <u>Wahlstrom v. Kawasaki Hearing</u>

Industries, Ltd., 4 F.3d 1084, 1086 (2d Cir. 1993).  The rule as stated by the Supreme Court in

Sesson v. Ruby, 497 U.S. at 675, is as follows:

> ". . . when a 'potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity, as does the navigation of boats in this case, admiralty jurisdiction is appropriate.'" (quoting from Foremost Ins. Co. v. Richardson, 457 U.S. 668, 675, 107 S.Ct. 2654, 2658, N.J. 73 L.E.2d 300 (1902).

The rules as stated in Moore v. Matthews, 445 F. Supp. 2d at 522 are clear and accurate:

> To prevail on their negligence claims, plaintiffs must establish the existence of a duty, a breach of that duty, and an injury proximately resulting from the breach of that duty.  Schumacher v. Cooper, 850 F.Supp. 438, 447 (D.S.C. 1994).  See also Thomas J. Schoenbaum, Admirality and Maritime Law § 5-2 (4th ed. 2001).

*   *   *   *   *

> When two or more parties have contributed by their fault to cause damages in a maritime collision such damages will be allocated among the parties proportionally to the comparative degree of fault.  See United States v. Reliable Transfer Co., Inc., 421 U.S. 397, 95 S.Ct. 1703, 44 L.Ed.2d 251 (1975).  As a result, contributory negligence is not a complete bar to the plaintiff's recovery, but merely mitigates damages.  Id.; Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 837, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996); Stolt Achievement, Ltd. v. Dredge B.D. Lindholm, 447 F.3d 360 (5th Cir. 2006); Double Eagle Marine, Inc., 208 F.Supp.2d 1250 (S.D. Ala. 2002); Hogge v. SS Yorkimar, 434 F.Supp. 715 (D. Md. 1977). See also Thomas J. Schoenbaum, Admiralty & General Maritime Law § 5-5 (4th ed. 2001).

Under the facts in this case, "Negligence under admiralty law is simply the failure to use

reasonable care under the circumstances."  Moore v. Matthews, 445 F.Supp.2d at 522; National

Shipping Co. Of Saudi Arabia v. Moran Mid-Atlantic Corp., 924 F.Supp. 1436, 1450 (E.D. Va.

1996) (citing 8 Benedict on Admiralty § 3.02[B][4]).  Also, when two parties have contributed

by their fault to cause damages in a maritime case, such damages must be allocated between the

parties proportionate to their comparative degree of fault.  United States v. Reliable Transfer Co.,

40

421 U.S. 397, 65 S.Ct. 1708, 44 L.Ed.2d 251 (1975).  Contributory negligence is not a complete

bar to a plaintiff's recovery, but merely mitigates damages.  Exxon Co. v. Sofec Inc., 517 U.S.

830, 837, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996); Stolt Achievement Ltd. v. Dredge B.E.

Lindholm, 447 F.3d 360 (5th Cir. 2006).

In this case, the plaintiff Thomas Podgurski has the initial burden of proving negligence

on the part of the defendants.

**B.  As to the Liability of the Defendant Meyran Marine Services Inc.**

The facts in this case are relatively simple and substantially undisputed.  The plaintiff

owned moorings for 2003 through 2009.  All of these moorings were installed by the defendant

Meyran Marine.  When the plaintiff was ready to launch his boat, the Girlcat, on May 14, 2009,

he was told by Matt Meyran that his regular mooring was not in the water and was directed by

Matt Meyran to use the Thompson Commercial mooring number 7.  Matt Meyran picked him up

at the mooring and he told Matt Meyran that it was very difficult picking up the heavy chain.  He

asked Matt Meyran to put a "pickup" on the mooring so it would be easier to use.  According to

the plaintiff, Matt Meyran responded, "don't worry I'm going to get your mooring done right

away."  In his testimony, Matt Meyran stated that he doesn't remember saying anything about a

pennant for the mooring assigned to the plaintiff.  The Court notes that Matt Meyran did not deny

saying that he will "get the plaintiff's mooring done."

On May 23, 2009, when the plaintiff arrived at commercial mooring number 7, where his

boat was moored, it still had no pennant or pickup on it.  It was when the plaintiff attempted to

untie his boat from mooring number 7 on May 23rd, when the middle finger of his right hand

"got caught between the carabiner and the shackle and his finger was crushed."  The plaintiff

further testified that prior to 2009, Meyran Marine never installed a mooring for him without a permanent pickup.

There is no doubt that Meyran Marine was responsible for the installation, maintenance and upkeep of mooring number 7. Their obligation was to install and maintain the mooring with reasonable maritime care. Matt Meyran testified that when Meyran Marine supplies a mooring they also include pennants. The pennant is installed with a shackle sometimes directly to the top of the mooring chain and sometimes with a swivel on top.

Significantly, Matt Meyran testified that "it would probably be easier (to use a mooring) if a pennant was on it." (Tr. at 181). Also, other than mooring number 7, Matt Meyran never assigned Podgurski to a mooring that did not have a pennant line. Apparently Meyran Marine had a verbal agreement with Mr. Thompson to use his moorings as "transient overflow moorings," if not being used by him. Matt Meyran also testified that after plaintiff kept his boat on the Thompson commercial mooring number 7 for the entire period of the summer season it would have had a pennant line and again, he testified "A line with a pennant and loop is easier to use." (Tr. at 288).

It was not difficult to install a pennant on the mooring. In fact, Matt Meyran testified that it takes only five minutes. So that in five minutes, with little effort and expense, the mooring could be made safer. With reasonable certainty, if the pennant had been installed, the plaintiff would have suffered no injury.

The plaintiff's maritime expert Claudio Norman Crivici testified that mooring number 7 was not a "complete mooring" because the pennant was missing as was the pickup buoy and a pickup line. In the fifty to one hundred mooring fields he has visited, including transient

42

moorings, he was never directed to a mooring that did not have a pennant line or a float on it. According to Crivici, "All the moorings have to have a pennant to attach to the mooring." (Tr. at 340). ". . . the pennant is always on the mooring." (Tr. at 355, 356). He stated that, "The purpose of a pennant and pickup is to facilitate safe use of the mooring ground tackle . . . It is this ability to pick up a mooring repeatedly in a safe fashion." (Tr. at 340, 344).

Further, Crivici testified that he did not believe "that the mooring was suitable for its intended purpose at that point . . .." (Tr. at 357, 358). Also, he described the method that the plaintiff was using to release his vessel from the mooring as ". . . definitely more difficult and dangerous, because it required now a lifting procedure and releasing procedure directly from the mooring ball versus just simply releasing a pennant and a pickup buoy from the deck of the vessel and just lifting them down into the water safely." (Tr. at 367, 368). Finally, Crivici testified that he firmly believed if there was a pennant on the mooring, that Podgurski would not have been injured in any way. (Tr. at 373).

Of importance, Senior Bay Constable Mallory Nathan testified that the "minimum mooring tackle specifications" in the Town of North Hempstead Mooring Tackle Guidelines include a requirement for a pennant. The specifications detail the diameter of the pennant. Also, he testified that the inclusion of a pennant would be part of a proper mooring in Manhasset Bay in the Town of North Hempstead. (Tr. at 441). He also testified that some transient moorings have pennants and some do not. However, if the boater doesn't feel comfortable attaching his own lines or some boats have a very high freeboard, a pennant will be attached. The pennants are attached by Meyran Marine and they could be installed "almost immediately, while they wait." (Tr. at 444). Nathan emphasized that the height of the freeboard of the vessel is an

43

important factor when there is no pennant.  The higher the freeboard – and the plaintiff's boat had a freeboard of four feet – the harder it is to connect to the mooring without a pennant because the person on board the vessel can no longer reach the mooring ball by just reaching down from the deck.

In the defendants' case, Matt Meyran testified that when the plaintiff used his regular mooring at DW61, he would snap his boat's pennant line into the top of the pennant line on DW61 to make one continuous pennant.  Matt Meyran explained that Meyran Marine does not receive compensation from the Town; its compensation is from the boat owners.  Matt Meyran also testified that on May 19, 2009, there was no other mooring in the town dock area that could have been safely used by the plaintiff's boat because of the larger swinging radius of the Podgurski boat.

Matt Meyran testified that today, six of the Thompson mooring lines 1 through 7 have a pennant line from the top of the mooring ball to the boat.  One empty mooring does not have a pennant line on it.  Also, on May 14, 2009 Meyran Marine possessed extra pennant lines.  So that if Meyran Marine wanted to it could have installed such a pennant line on Thompson Commercial mooring number 7.  Incidentally, the cost of the pennant is included in the price when a customer rents a mooring from Meyran Marine.  Also of importance in this case, Matt Meyran testified that when he installed the plaintiff's regular mooring, he always included a pennant line.  (Tr. at 554-56).  He also stated that "on all prior occasions . . . his mooring always had a pennant line."  Why then was it not included in the temporary mooring number 7?

Further, Matt Meyran testified that for a boat that has three and a half feet or higher of freeboard, "having a pennant line makes the mooring easier to use than if it does not have a

pennant." (Tr. at 562).  The Podgurski catamaran has a freeboard of approximately four feet. Under the analysis, it should have had a pennant.  Concluding his testimony, Matt Meyran stated that he never saw anyone use the Manhasset Bay moorings without a pennant.  (Tr. at 562).

The Court finds that the plaintiff Thomas Podgurski has established by a preponderance of the evidence in this case, that a cause of his injury to the middle finger of his right hand, sustained on May 23, 2009, at the Thompson Commercial Mooring number 7, was the negligence of the defendant Meyran Marine Services, Inc.  The defendant Meyran Marine Services had a duty to exercise reasonable care when it permitted the plaintiff to use the number 7 mooring and when it set up the mooring.  The defendant Meyran Marine failed to use reasonable care under the circumstances of this case.  The defendant Meyran Marine violated the duty of reasonable care owed to its customer, resulting in the injury sustained in this case.

## C.  As to the Liability of the Defendant Town of North Hempstead

Matt Meyran testified that he had discussions with the Town Bay Constable with regard to the seven commercial moorings including number 7.  However, he never received anything in writing from the Town of North Hempstead permitting Meyran Marine to use mooring number 7 for the year 2009.  Nevertheless, the bay constable thought it was a good idea to use these moorings.

Senior Bay Constable Mallory Nathan of the Town of North Hempstead testified that the Town issues permits for moorings in Manhasset Bay.  The permit for Thompson Commercial mooring number 7 was issued on August 17, 2009, after these occurrences.  Therefore, at the time of the occurrences, there was no permit for mooring 7 from the Town.

The plaintiff rented the mooring at issue from Meyran Marine, not the Town of North

Hempstead.  As to his permanent mooring, DW61, Podgurski owns this mooring and pays Meyran Marine $200 per year for hauling, set up and maintenance of his mooring ball and chain. When boat owners obtain a permit from the Town, they receive written notice that Meyran Marine will install the mooring.  The Town has nothing to do with the installation or maintenance of the mooring as issue in this case.

The Court finds that the plaintiff has failed to prove that the defendant Town of North Hempstead violated any duty owed to the plaintiff or that the Town was negligent in any manner with regard to the injury sustained by the plaintiff.  Therefore, judgment is granted in favor of the defendant Town of Hempstead dismissing the complaint against the Town.

### D.  <u>As to Contributory Negligence on the Part of the Plaintiff</u>

A major player in demonstrating contributory negligence on the part of the plaintiff was his own expert, Claudio Norman Crivici.  He described the plaintiff's attempt to unfasten the vessel as an "awkward maneuver" and that "it was not a good maneuver to put your body into" and "not a good place to put your finger."  (Tr. at 412).  He also testified that "a properly trained sailor should not have tried to secure a chain with their finger," (Tr. at 412) and "a properly trained individual would not have put that finger under the shackle."  (Tr. at 421).

Also Matt Meyran testified, as an experienced mooring inspector and mooring installer, that it was "not a good idea" for an experienced sailor to put his finger in the shackle and keep it there while the chain was on a heavy load, "because you could get hurt."  (Tr. at 533).

The Court finds that the defendants have established, by a preponderance of the evidence, that the incident that caused the injury to the plaintiff Thomas Podgurski, was, in part, caused by his own contributory negligence.  The defendants have established that the plaintiff did not

46

exercise sufficient care for his own protection.  See e.g. Werner v. Ellen Ritter, 282 A.D.2d 525, 526, 723 N.Y.S.2d 216, 217 (2d Dept. 2001) (The plaintiff was negligent when he was injured when he and a co-worker attempted to extract plaintiff's lodged vehicle and the plaintiff placed his hand beneath the bumper and tried to lift it.)

### E. **As to Apportionment of Liability**

The Court having found that Meyran Marine, the entity that provided the mooring to the plaintiff and set up the mooring, and the plaintiff, the injured party, were both negligent which combined to cause this occurrence.  The Court will now determine the question of apportionment.

In apportioning, the Court must weigh the relative degree of fault as between the plaintiff and Meyran Marine and determine as between those parties what part of the total fault shall be apportioned to each by way of a percentage of fault for each.  In making that determination, the Court will consider the duties owed by each of these parties and the question of whether the conduct of that party deviated from the duty that he and it owed, and weigh the relative degree of fault for each, expressed as a percentage of the total fault of both parties.  Weighing all the facts and circumstances, the Court must consider the total negligence, that is, the negligence of both the plaintiff and the defendant Meyran Marine which contributed to causing this occurrence and determine what percentage of negligence is chargeable to each.

After reviewing the facts and the law, the Court apportions the liability of the plaintiff and the defendant Meyran Marine as follows:

47

| | |
|---|---|
| Percentage of total fault apportioned to the defendant Meyran Marine Services Inc. | 50% |
| Percentage of total fault apportioned to the plaintiff Thomas Podgurski | 50% |

## F. **The Injuries**

The plaintiff testified that when he tried to let go of the carabiner, his middle finger of his right hand got caught between the carabiner and the shackle and his finer was "crushed and bleeding." (Tr. at 70). His finger was dangling by a thread of skin and flesh. He put his finger back in place and covered it and applied a tourniquet to stop the bleeding. The plaintiff was taken by ambulance to the North Shore Hospital where Dr. Cohen-Kashi, a plastic surgeon, performed an operation in which a nail was inserted to put the two separate pieces of his finger together. The plaintiff passed out from the pain. He was discharged from the hospital later that same day.

Subsequently, the plaintiff was treated by Dr. Cohen-Kashi, Dr. Tuckman, a hand specialist, Dr. Shatzer, a pain specialist, Dr. Gerstein in Manhattan and Dr. David Benatar. As to the present condition of the finger, the plaintiff testified that he cannot bend the tip digit of the finger, because it is inflexible. The hand itself is sensitive and weak and he drops things. He has constant pain when he moves the finger. The pain wakes him up at night. Frequently he gets cramps up his right arm. The plaintiff has played the guitar from the time he was eleven years of age, including playing professionally. After this injury he testified that he cannot play the guitar because his finger "doesn't do what I want it to do." (Tr. at 92), although there is a contrary statement in Dr. Cohen-Kashi's notes.

Dr. David Benatar testified at the trial.  He is a board certified orthopedic surgeon.  Dr.
Benatar was retained by an attorney for the plaintiff to examine the plaintiff.  He performed the
examination on March 24, 2011.  He diagnosed the plaintiff's initial injury as a crush injury with
a fracture of the right middle finger with an open reduction.  The injury was treated by open
reduction surgery with internal fixation by insertion of a metal pin.  In addition, there was a
laceration and injury to the nail bed.  The examination by Dr. Benatar on March 24, 2011
revealed that the finger nail was significantly deformed, in that it was "clumped" or coming
down over the tip of the finger.  The nail was discolored yellow and the shape was abnormal.
The finger itself was tender to touch and stimulation of the finger caused pain.  There was
decreased sensation and sensory loss with regard to the proximinal surface of the finger.  The top
of the finger and the side of the hand was painful.  The whole surface of the finger was
"decreased and painful, like up the long finger."  (Tr. at 402).  The distant phalanx, the last bone
past the last knuckle was enlarged and angulated toward the thumb, namely, held in an abnormal
flex position.

In addition, there was a significant decrease in sensation and strength in the finger, which
affected the overall grip and strength of the right hand.  The plaintiff was unable to close his
finger to his palm, even with pushing.  This condition was permanent.  There were also scars
from the laceration and the surgery.  In Dr. Benatar's opinion, this injury would prevent the
plaintiff from playing the guitar.  Dr. Benatar sent the plaintiff for a test to confirm or measure
the loss of sensation in the finger.  He explained the results of the test, as follows:

Q.      Why did you want Mr. Podgurski to undergo the West test?

A.      The sensation on the palmer surface of the digit was poor.  And he is able to put
his finger on a hot plate and not knowing it is burned until it is too late.  And that
is something he needs to know.  Because if he needs to protect the digit and to be
careful of not exposing himself, he should be award.  He had not had the test prior

to my sending him.

Q.    Did you receive the results of the West test?

A.    Yes.

Q.    What did those results tell you?

A.    On the palmer surface of his hand, the hand part you put down on something, he had what is called purple sensation, and that means that he has diminished protective sensation.  And he also had red areas, which is the worst, and that is loss of protective sensation, meaning literally putting your finger on a hot pan or oil, etcetera, you would not know it.

        He had one small area of blue, which was diminished to light touch.  In other words, he would feel something burning, but soft touch he would not.

        So the digit was at risk, particularly on the palmer surface.

Q.    Did the West test confirm your observation that Mr. Podgurski had a loss (of) sensation in the middle finger of his right-hand?

A.    Completely.

Q.    What effect does that type of loss of sensation have on the use of the hand or finger?

A.    I think the best way to explain that is an analogy.

        A lot of people suffering carpel tunnel syndrome tell you if they grab a mug, they would drop it, they can't feel it and not putting any force.

        The same thing here; if you can't feel something, you don't know how much pressure to apply.  So even holding a pencil, something with no weight, you drop it because you are not actually looking at it to see you are touching it.  So that sort of use with his hand he can't do without looking.  If he is not looking at it, he can't see that he is holding it.  So it affects that function.

Tr. at 211, 212.

    The fracture was reduced by the insertion of a kirschner wire or a k wire as it is generally

called.  The k wire was drilled into the bone by a power drill, and remained in the plaintiff's

finger.  After approximately six weeks, the k wire was removed by a wrench that pulled the wire out of the finger.

Dr. Benatar took x-rays of the plaintiff's hand on March 24, 2011.  They revealed that the plaintiff's finger tip is abnormal in that it is angled almost 40 degrees and the joint space is "basically obliterated."  (Tr. at 218).  Also, "the amount of arthritis that occurred in the 22 month period was dramatic.  He has virtually no joint left here . . .."  (Tr. at 219).

Dr. Benatar was asked about the plaintiff's prognosis.  He responded that, in terms of that digit the progress was poor.  The plaintiff will require treatment for that digit in the future with occupational therapy; medication; a steroid shot to try to decrease the pain; and "ultimately, the treatment of choice is a fusion."  (Tr. at 219).  A fusion is to connect two bones together.  In this case, it is to connect the middle phalanx to the distal phalanx and hold them in place with a metallic fixation.  While this fusion helps the pain, the finger joint cannot move again.  "It is connected permanently.  So it will be that the joint doesn't move."  (Tr. at 220).  The purpose of the fusion is the relief of pain.

Dr. Benatar was asked to estimate the cost of future treatment, including fusion.  In addition to the costs of medication, occupational therapy is about $75 to $100 a visit or $1,200 a month.  Steroid injections could be "possibly three or four hundred dollars."  (Tr. at 221).  Repeat x-rays are about $100 a set.  The real cost is the surgery.  The surgeon's fee is $3,000 to $5,000, and the hospital cost would exceed $10,000.  With the medical services required after surgery, including physician services, and medication, the surgery "greatly exceeds $25,000 . . . (and) a realistic cost in today's society is $40,000 to $50,000."  (Tr. at 222).  Dr. Benatar testified that with a reasonable degree of medical certainty, the incident of May 23, 2009 caused the injury to

the plaintiff and will require the fusion.

> Q.      Dr. Benatar, can you state with a reasonable degree of medical certainty the cause of the injuries you described to Mr. Podgurski's right middle finger and his hand?

> A.      Yes.  The injury that occurred on May 23, 2009 is the cause of all this.

> Q.      Can you state with a reasonable degree of medical certainty that the future treatment you have described for us will be required by Mr. Podgurski?

> A.      He will require - - I wouldn't expect it to be very long before he needs the fusion.

Tr, at 222, 223.

On cross-examination it was elicited from Dr. Benatar that hand surgery is a sub-sub-specialty, and he is not a hand surgeon specialist.  Thirty to forty percent of his practice was in spinal surgery and he last operated in 2003 or 2004 or 2005.  He did most of his hand surgery in training and not much in practice.  In addition only five to ten percent of his testimony in court involved injuries to hands and fingers.

In addition, it was elicited from Dr. Benatar that the plaintiff saw Dr. Tuckman on June 18, 2009, within one month of the occurrence.  Dr. Tuckman placed him in a splint, recommended a course of occupational therapy and he told the plaintiff to return within one month for new x-rays.  However, the plaintiff never returned to Dr. Tuckman.   According to the records, the plaintiff did not participate in occupational therapy or physical therapy in 2009 and 2010, and only began such treatment in March of 2011.

A review of the record of Dr. Cohen-Kashi revealed a report of a June 24, 2009 visit.  At that time, the plaintiff was planning a sailing trip, while taking bectrin, an antibiotic.  In a July 17, 2009 report from Dr. Cohen-Kashi, it indicates that a pin infection was resolved; that the fixation point had good alignment; and not much callous was noted.  Also the July 17, 2009 entry

indicates that the doctor discussed the possibility of malunion with the patient which, according to Dr. Benatar is what he ended up with.  While the report says "follow up in four weeks," the plaintiff did not visit Dr. Cohen-Kashi again until January 19, 2010, some six months later.  In the report of the January 19, 2010 visit, Dr. Cohen-Kashi indicates that the patient is doing well; returned to playing guitar; and his sensation of two different stimuli is good.  Also, at the end of the January 19, 2010 report it indicates "resume normal activity."

It was also adduced from Dr. Benatar that tenderness and pain is always subjective.  Also, range of motion and grip is a subjective response.  In addition, between the last visit to Dr. Cohen-Kashi on January 19, 2010 and March of 2011, there were no references in any medical records relating to the complaints the plaintiff gave Dr. Benatar.

In their case, the defendants did not produce a medical witness.

## G.  **The Damages**

The plaintiff Thomas Podgurski sustained a serious and permanent injury to the middle finger of his right hand.  Also, there is competent medical evidence that he will need surgery in the nature of a fusion operation, which may obviate certain pain but will cause a permanent stiffening of the middle finger.  In addition, of importance in the measure of damages in this case, there is no evidence of any loss of earnings.  Also, strangely, there is little evidence of medical expenses, other than an estimate of $40,000 to $50,000 for the future treatment and fusion surgery.

As to damages, a review of the precedentis is always helpful.  The review revealed a number of cases where the plaintiff's finger or fingers were actually amputated.  Happily, this did not occur in this case.  However, there are some cases that are instructive.  The Court will try to

review appellate cases reviewing damages, rather than jury verdicts, which are subject to review.

1. Conley v. City of New York, 40 A.D.3d 1024, 837 N.Y.S.2d 702 (2d Dept. 2007). The plaintiff suffered a comminuted fracture to the distal radius of her right hand which required surgery including insertion of a metal plate and screws; with permanent traumatic arthritis. Held, the court set past pain and suffering of $125,000 and future pain and suffering of $75,000.

2. Biejanov v. Jeno David Guttman, 31 A.D.2d 710, 826 N.Y.S.2d 111 (2d Dept. 2006). A four year old plaintiff sustained a fracture to his thumb and left index finger and permanent damage to the ulnar nerve. Subsequent to surgery, he could not fully straighten his left index finger and lost partial feeling in his third finger. The reduced jury verdict of $250,000 for past pain and suffering and $350,000 for future pain and suffering was affirmed.

3. Allende v. New York City Health & Hospital Corp., 228 A.D.2d 229, 694 N.Y.S.2d 18 (1st Dept. 1996) (reversed as to liability by the Court of Appeals). Two fingers were partially amputated. The index finger and middle finger of the plaintiff's dominant hand were partially amputated. The court affirmed $250,000 for past pain and suffering and $500,000 for future pain and suffering for a total of $750,000 with regard to a plaintiff with a 30.7 year life expectancy.

4. Fields v. City University of New York, 216 A.D.2d 87, 628 N.Y.S.2d 76 (1st Dept. 1995). An injury to the non-dominant hand of a 14 year old girl who sustained an amputation of a third of her ring finger and decreased sensation in two of her other fingers, with pain, loss of function, nerve damage and unattractive deformity, all of which was uncontradicted. The court affirmed an award of $400,000 for past and future pain and suffering.

5. Widawski v. United Beef Packers, 183 A.D.2d 444, 585 N.Y.S. 2d 1013 (1st Dept. 1992). The plaintiff sustained a severed ulnar nerve of his dominant right hand. Held, "The

jury's award of $100,000 and $187,000 (over 25 years) for past and future pain and suffering, respectively, as well as $500 for past medical expenses and $2,500 for future medical expenses, does not deviate materially from what would be reasonable compensation."

After a review of the record in this case and the precedents, for all the injuries and the pain and suffering sustained by Thomas Podgurski to the present date, the Court awards the sum of $125,000.  For the pain and suffering to be suffered by Thomas Podgurski in the future, the Court awards the sum of $125,000.  In addition, the Court awards to the plaintiff future medical expenses in the sum of $45,000.

In sum, after the reduction in the award based on the Court's finding of 50% contributory negligence, the net award is as follows:

| | |
|---|---:|
| Past pain and suffering | $ 62,500 |
| Future pain and suffering | 62,500 |
| Future medical expenses | 22,500 |
| Total: | $147,500 |

The Clerk of the Court is directed to enter judgment in favor of the plaintiff Thomas Podgurski against the defendant Meyran Marine Services, Inc., in the sum of $147,500.

The Clerk is thereafter directed to close this case.


**SO ORDERED**.


Dated: Central Islip, New York
       November 14, 2011


                    _/s/ Arthur D. Spatt_____
                          ARTHUR D. SPATT
                    United States District Judge


55